**GAS AND ELECTRIC DEPARTMENT OF the CITY OF HOLYOKE, MASSACHUSETTS, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Holyoke Water Power Company, Intervenor.**

**No. 79–1587.**

United States Court of Appeals, First Circuit.

Argued April 10, 1980.

Decided Aug. 14, 1980.

As Amended Sept. 10, 1980.

Frances E. Francis, Washington, D. C., with whom Marc R. Poirier and Spiegel & McDiarmid, Washington, D. C., Maurice J. Ferriter and Begley, Ferriter, Brady & Lavelle, Holyoke, Mass., were on brief, for petitioner.

Joseph G. Stiles, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Robert R. Nordhaus, Gen. Counsel, and Jerome M. Feit, Acting Deputy Sol., Federal Energy Regulatory Commission, Washington, D. C., were on brief, for respondent.

Jerome Ackerman, Washington, D. C., with whom Terry Coleman and Covington & Burling, Washington, D. C., were on brief, for intervenor.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, LOUGHLIN,* District Judge.

BOWNES, Circuit Judge.

In 1849, the predecessor of the Holyoke Water Power Company constructed a masonry dam across the Connecticut River at Hadley Falls, near Holyoke, Massachusetts. More than one thousand feet long and thirty feet high, the dam created an enormous head of water to power local industries. By 1948, the dam diverted water into miles of canals on both sides of the river, generating fourteen megawatts of mechanical energy for industries along the canals and eleven megawatts of hydroelectric energy for local utilities.

In 1948, the Holyoke Water Power Company (the Company) filed an application with the Federal Power Commission [1] (the

---

* Of the District of New Hampshire, sitting by designation.

1. The Federal Energy Regulatory Commission, created on October 1, 1977, under the Department of Energy Organization Act, 42 U.S.C. §§ 7101 *et seq.* and Executive Order No. 12009,

Commission) for a license for its existing facilities[2] and proposed new generating capacity at Hadley Falls. The Company's application proposed immediate installation of one fifteen megawatt turbine and eventual development of sixty megawatts of capacity at the site. The Gas and Electric Department of the City of Holyoke (the Department) promptly filed a competing license application, seeking to win control of Hadley Falls by use of the municipal preference provisions of the Federal Power Act.[3] The Department's application also proposed an eventual site capacity of sixty megawatts, but, unlike the Company's application, proposed the immediate installation of two fifteen megawatt turbines.

In evaluating the competing applications, the Commission found that the Department lacked authority under Massachusetts law to construct a project which lay, in part, outside municipal boundaries and that the Department lacked the means to finance the project. More importantly, the Commission found that, as designed, the Depart-

ment's project failed to make efficient use of the water resource and was not economically feasible. Because of these disabilities, the Commission concluded that the Department failed completely to show eligibility for the municipal preference. *Holyoke Water Power Company*, 8 F.P.C. 471, 488 (1949). The Commission, pursuant to 16 U.S.C. § 803(a),[4] then determined the Company's plan of development to be the best adapted to a comprehensive plan for improving and developing the river and awarded a fifty year license to the Company. The Department took no appeal.

In this case, the Department attempts again to obtain part of the development opportunity it lost to the Company in 1949. Specifically, the Department appeals the Commission's denial of its 1978 application for a preliminary permit[5] to study the feasibility of installing a second fifteen megawatt turbine at the Company's Hadley Falls dam. As framed by the Department, this appeal poses several significant questions of energy law and policy.[6] The threshold

42 Fed.Reg. 46267 (September 13, 1977), is the successor to the Federal Power Commission. Many of the FPC's regulatory responsibilities under the Federal Power Act, including those relevant to this case, were transferred to the FERC.

2. Hydroelectric power projects in existence at the passage of the Federal Power Act in 1920 and possessing valid pre-1920 federal permits or rights-of-way do not require a license unless they are significantly modified after 1920. 16 U.S.C §§ 796(11), 817; *Minnesota Power & Light Co. v. FPC*, 344 F.2d 53 (8th Cir. 1965).

3. Section 7(a) of the Federal Power Act gives states and municipalities a preference over all other applicants for preliminary permits and licenses, provided that the plan of development of the state or municipality can be made, within a reasonable time, equally well adapted "to conserve and utilize in the public interest the water resources of the region." 16 U.S.C. § 800(a).

4. Section 803(a) of the Act provides:
 (a) That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement

and utilization of water-power development, and for other beneficial public uses, including recreational purposes; and if necessary in order to secure such plan the Commission shall have the authority to require the modification of any project and of the plans and specifications of the project works before approval.

5. Under the Act, preliminary permits are available for up to three years to maintain priority of application for a license while the permittee conducts studies necessary to prepare a complete license application. A preliminary permit allows the holder to conduct such studies without the risk of losing the site to a competing applicant. 16 U.S.C. § 798.

6. Issues raised by the Department include: (1) whether the Commission may license project works for other than immediate construction or construction at a specific time; (2) whether the Commission may order modification of a project not yet fully approved by the Commission; (3) whether the annual charge for F.E.R.C. licensees is in any way determinative of the scope of F.E.R.C. licenses; (4) whether a state or municipal applicant may rely on the public preference provision of the Federal Power Act more than once in regard to the same site; (5) whether the Department was entitled to a comparative hearing on its application for

question, however, is whether the Commission's 1979 interpretation of the license issued to the Company in 1949 to include authorization to install the second turbine at Hadley Falls was clearly erroneous. We find no error in that determination. We affirm the Commission's rejection of the Department's preliminary permit application on the grounds the 1949 license included authorization, subject to a condition subsequent, for the installation of the second turbine and that the time has long since passed for the Department to challenge the Commission's 1949 licensing decision. Accordingly, the other issues raised by the Department on appeal are not timely, and we do not consider them.

The efficient use of the water flowing past Hadley Falls was a crucial factor in the Commission's 1949 decision to award the Hadley Falls license to the Company and to authorize the immediate installation of only one fifteen megawatt turbine. The Company proposed installation of one fifteen megawatt turbine and maintenance of the more than four miles of existing canals and generating facilities; the Department proposed installation of two fifteen megawatt turbines and the dewatering[7] and filling in of the canal system. The Department's apparent purpose for diverting water from the canals into the two turbines was to increase the flow of water to the turbines, increase the load factor or operating efficiency of the turbines and, thereby allow the Department to rely on the turbines for a more constant source of power.[8] Dewatering of the canals would have resulted in

the loss of power generation and eliminated the water table created by them, both of which are vital to the industries located along the canals. It also would have forced the City of Holyoke to construct a new industrial waste treatment plant and necessitated construction of a conduit to carry process water to manufacturing industries along the canals. The commission staff submitted to the Commission a "proposed ultimate comprehensive plan of development" to provide a standard for evaluating the competing applications. The staff plan, which placed a high priority on the efficient use of flowing water, recommended an eventual new generating capacity of sixty megawatts, use of the canal system as long as it remained economical, an increase in the storage capacity of the dam and the economic dispatch of water. Significantly, the staff plan also recommended a staged development at Hadley Falls:

> With its ultimate plan as an objective, the Commission's staff recommends its development, in steps, as market demands require. The initial step which would fit into the comprehensive plan would be the construction of one or two 15,000-kilowatt units with a two-unit tailrace; the complete substructure and superstructure for one or two units; a forebay; one or two complete powerhouse units; the intake structures for the future units, including a concrete slab acting as a bulkhead, and raising of the wall between the first-level canal and the new forebay and leaving the present normal water surface eleva-

a preliminary permit; and (6) whether the Director of the Office of Electric Power Regulation is authorized to reject preliminary permit applications for other than technical reasons.

7. "Dewatering" appears to be a term of art meaning the act of stopping the flow of water to a structure or mechanism which operates by or depends upon water.

8. The development plan of the Department proposed in 1948 suggests that the Department sought to use Hadley Falls to produce intermediate or base load power. The Commission's decision indicates that the Company's plan called for the continued use of the Hadley Falls facilities to produce peaking power. *Holyoke Water Power Company*, 8 F.P.C. 471, 480

(1949). The different load characteristics of the two utilities remained an issue in 1978, as the Department contended that the Company's parent organization, Northeast Utilities, possessed so much unused generating capacity that the Company had no reason to develop the second turbine at Hadley Falls. The Department, on the other hand, was as eager to obtain increased capacity in 1978 as it was in 1948. Since we decide this case on the basis of the terms of the original license, we do not reach the issues raised by the ownership or control of hydropower sites with valuable, untapped potential by entities which have no need to develop that potential.

tion of 100.6 feet (mean sea level) unchanged.

*Holyoke Water Power Company*, 8 F.P.C. at 481.

In its decision awarding the license to the Company, the Commission gave great weight to the similarities between the staff plan of development and the plan of the Company. In particular, the Commission noted that, when the Company's plan to preserve the canals was combined with the staff plan for the economic dispatch of water, the capacity of the existing system would be increased by nearly three megawatts to a total of twenty-eight megawatts, all at no extra cost. In contrast, the Department's plan to dewater the canals and install two fifteen megawatt turbines would result in a net increase in capacity of five megawatts at a cost of $13,000,000. The Company's plan to install one fifteen megawatt turbine would increase the capacity of Hadley Falls to forty-three megawatts at a cost still far below that of the Department's thirty megawatt plan. The Commission further observed that the Company's plan of development provided for use of the full flow of the river seventy percent of the time, while the Department's plan would result in the full flow only forty-two percent of the time.

Because of its relationship to the efficient use of water and the current value of hydroelectric energy, the installation of the second fifteen megawatt turbine received close study by the Commission. The Commission seemed to be influenced in its analysis by the fact that not all of the output of the second turbine could be marketed immediately and that the second turbine would not, at least initially, produce an increase in dependable capacity:

> *Economic feasibility of a second unit.*
> —The estimated incremental cost for the construction of a second unit is $1,700,-000, with an annual cost of about $173,-000, based on a 5 percent interest rate.
> The second unit would result in the production of an additional 40,000,000 kilowatt-hours with no increase in dependable capacity initially. On the assumption

that three-fourths of this additional 40,-000,000 kilowatt-hours could be used in the total load of the Company, the Department, and the mills by 1955, and using the value of 4.53 mills per kilowatt-hour for energy, the value of the increased power would be about $136,000. The annual cost would exceed the annual benefits by about $37,000, thus making the second unit presently economically infeasible. On a 3 percent interest rate as an element in the annual charge for the second unit the average annual charge would be about $131,000 as compared with $173,000, and the annual benefits would exceed the annual cost, by about $5,000.

*Id.* at 482.

The Commission's analysis showed that, although the second turbine was not economically feasible, it was sufficiently close to feasibility to justify construction of the project to permit installation with little or no modification of the project works. In its order issuing the license, the Commission gave specific form to the staff's general proposal of staged development at Hadley Falls:

> (B) The licensee shall commence the proposed initial redevelopment comprising the new power plant with initial installation of one 15,000-kilowatt unit, the headwork structure of the first and second 15,000-kilowatt units, and the tailrace and forebay adequate for the two units, within 1 year and shall complete such initial redevelopment within 3 years from the date of issuance of this license.
>
> (C) The licensee shall install the second 15,000-kilowatt unit in the new power plant at such time as the Commission may hereafter direct.
>
> (D) To the extent that it is economically sound and in the public interest to do so, the licensee shall further enlarge the project as directed by the Commission after notice and hearing.

*Id.* at 491. Article 2 of the license issued to the Company described the physical structures authorized for construction:

a new power plant to be located on the south end of the masonry dam on the Holyoke side of the Connecticut River, with initial installed capacity of one 21,-500 horsepower turbine unit and ultimate installed capacity of 86,000 horsepower in four equal units; initial construction would include the headworks structures for the first and second units, and a tailrace to be excavated for two units and a forebay. Space would be reserved adjacent to the initially constructed plant for the future third and fourth units.

Article 5 of the license authorized the installation of the generating units:

> Subject to the provisions of Section 13 of the Act, the licensee shall commence construction of the proposed initial redevelopment comprising the new power plant with initial installation of one 15,000 kilowatt unit, the headworks structure of the first and second 15,000 kilowatt units, and the tailrace and forebay adequate for the two units, * * * and shall within three years from the date of such issuance of this license complete such initial redevelopment; shall install the second 15,000 kilowatt unit in the new power plant at such time as the Commission may hereafter direct; and to the extent that it is economically sound and in the public interest to do so, the Licensee shall further enlarge the project as directed by the Commission after notice and opportunity for hearing.

The Company accepted the license and complied with its terms, constructing headworks, tailraces and other physical structures for two fifteen megawatt turbines and installing one turbine. The Commission has never directed the Company to install the second turbine.

Interest in installation of the second turbine was revived by recent increases in the price of oil and consequent increases in the value of hydroelectricity as a replacement source of power. On January 30, 1978, Northeast Utilities, the parent company of Holyoke Water Power Company, wrote the Commission stating its intention to "per-

form a detailed economic feasibility study [of the second unit], and, if favorable, to obtain approvals necessary for construction and operation of the second unit." Shortly thereafter, the Department informed Northeast Utilities of its interest in developing the second unit. Northeast Utilities rebuffed that and similar Department overtures on several occasions, each time stating its belief that the second unit was included in the original license and its intention to develop the unit itself. On August 2, 1978, the Department filed with the Commission its application for a preliminary permit for installation of a second unit at Hadley Falls.

After several procedural stops and starts, the Commission rejected the Department's application for a preliminary permit on November 15, 1978. The basis for the rejection was the conclusion that the second unit was a project works licensed to the Company in the 1949 license and that such staged development was consistent with Section 13 of the Federal Power Act and Commission policy in administering the Act. *Order Rejecting Applications for Preliminary Permits*, November 15, 1978. The Department petitioned for rehearing, raising several new arguments and recasting others. The Commission denied the petition for rehearing, but used the occasion to expand upon its order of November 15, 1978, to address in detail the issues raised by the Department. *Order Denying Rehearing*, September 7, 1979. The Department raises the same issues on appeal.[9]

In its Order Denying Rehearing, the Commission ruled:

> Articles 2 and 5 of the license together show that the second unit is part of the licensed project works, with all preparation for its initial installation made in the initial construction work under the license to be installed by HWPC when directed by the Commission.

 Unless we find the Commission's interpretation of a license it has issued to be clearly erroneous, we must uphold that

9. *See note 5, supra.*

interpretation. *Nelson, Inc. v. United States*, 355 U.S. 554, 558, 78 S.Ct. 496, 499, 2 L.Ed.2d 484 (1958); *Dart Transit Co. v. United States*, 567 F.2d 818, 820 (8th Cir. 1977); *D. C. Transit Systems, Inc. v. Washington Metropolitan Area Transit Commission*, 366 F.2d 542, 544 (4th Cir. 1966). In light of the facts surrounding the 1949 licensing of Hadley Falls, we find no error in the Commission's interpretation of that license to include authorization for the Company to install the second turbine at the direction of the Commission.

As we have observed earlier, the efficient use of available river flow and the uncertain market for power in the Holyoke area made the installation of the second turbine a critical factor in the 1949 license competition. We think that the order granting the license, and the license itself, reflect a conclusion by the Commission that, as the value of hydroelectric power increased, the second unit would become economically feasible, despite the fact that its operation would reduce the efficiency of the other units at Hadley Falls. To achieve economies of scale in construction, the Commission directed the Company to construct the new power plant, including headwork structures, forebay, and tailraces, so that the second turbine might be installed with little or no modification of the project works. The Commission then ordered a staged development of the sixty megawatts of capacity at Hadley Falls: one fifteen megawatt turbine installed immediately; a second fifteen megawatt turbine installed at the direction of the Commission; and the third and fourth fifteen megawatt turbines installed at the further direction of the Commission, but only after full hearings on the issues of economic feasibility and satisfaction of the public interest.

We find highly persuasive the fact that the second turbine could be installed at the unilateral pleasure of the Commission. This procedure contrasts sharply with the procedure for the substantive amendment of a license under the Federal Power Act, a procedure which requires the consent of the licensee. *See* 16 U.S.C. § 799. The only consent as to the installation of the second unit was given by acceptance of the license. *Id.* Consequently, there can be no doubt that the second turbine is part of the original license, subject to the condition subsequent of Commission approval.[10]

■ We disagree with the Department's contention that the Commission's interpretation of the license conflicts with the Act because the license places no time limit on the installation of the second turbine. Section 13 of the Act provides, in relevant part:

The licensee shall commence the construction of the project works within the time fixed in the license, which shall not be more than two years from the date thereof, shall thereafter in good faith and with due diligence prosecute such construction, and shall within the time fixed in the license complete and put into operation such part of the ultimate development as the commission shall deem necessary to supply the reasonable needs of the then available market, and *shall from time to time thereafter construct such*

---

10. We note that, since 1964, the Commission has inserted a boilerplate clause in licenses providing that "the Licensee shall install additional capacity or make other changes in the project as directed by the Commission." Acceptance of a license containing a particular clause constitutes consent to lawful orders issued pursuant to the clause. 16 U.S.C. § 799. Although the practical effect of this clause is to subject the licensee to the will of the Commission in regard to the future development of the site, the Commission has not interpreted the clause as giving the licensee a monopoly on all future development within the project boundary. *Madison Electric Works Dept., Project*

*Nos. 2830, 2915* (June 25, 1980). Consequently, the Commission has also concluded that third parties are not precluded from seeking permits or licenses for project works located within project boundaries, but which are not included within existing permits or licenses. *Id.* at 4. This general clause, which contemplates no specific development, is clearly different from clause (B) in the Holyoke license and serves to further distinguish the staged development provided for in *Holyoke Water Power Co., supra*, from a licensee's obligation to develop the site as the Commission determines is in the public interest.

**204**

*portion of the balance of such development as the commission may direct*, so as to supply adequately the reasonable market demands until such development shall have been completed.

16 U.S.C. § 806 (emphasis added).

The Commission relied on Section 13 on rehearing:

Section 13 of the Act, as we have noted earlier, contemplates that some project works may not have a time for completion fixed in the license. Those works may be developed later when the Commission directs, as necessary to supply reasonable market demands. For Project No. 2004, the Commission did not fix an installation date in the license, but provided for later installation when the energy from that unit could be marketed economically.

This interpretation of Section 13 is consistent with prior decisions of the Commission. In *Idaho Power Co.*, 14 F.P.C. 55, 69 (1955), *aff'd sub nom. National Hells Canyon Association v. F.P.C.*, 237 F.2d 777 (D.C.Cir.), *cert. denied*, 353 U.S. 924, 77 S.Ct. 681, 1 L.Ed.2d 720 (1957), the Commission held that project works to be constructed subsequent to the four-year period for commencement of construction in immediately authorized projects are within the discretion of the Commission. To hold, as the Department urges, that all such orders or reservations of authority in licenses must have time limits would be to confuse the "shall from time to time thereafter" clause of Section 13 with the "shall within the time fixed in the license" clause of the same section. In addition, such a holding would place the Commission in the difficult position of having to predict with accuracy the date of economic feasibility of presently economically infeasible units. We think it is sufficient for these purposes that the Commission's interpretation of Section 13 is reasonable and longstanding. We therefore give specific weight to it, *Chemehuevi Tribe of Indians v. F.P.C.*, 420 U.S. 395, 409–10, 95 S.Ct. 1066, 1075, 43 L.Ed.2d 299 (1975); *Maine Public Service Co. v. F.P.C.*, 579 F.2d 659, 665 n.10 (1st Cir. 1978), and will not

substitute our judgment for that of the Commission. *See Train v. Natural Resources Defense Council*, 421 U.S. 60, 87, 95 S.Ct. 1470, 1485, 43 L.Ed.2d 731 (1975).

Since we agree with the Commission's determination that the second turbine was covered by the 1949 license issued to the Company, it follows that we agree with the Commission and the intervenor that the time has long since passed for the Department to challenge the Company's authority to install the second unit. Under the Act, a petition for rehearing must have been filed within thirty days of the 1949 decision, 16 U.S.C. § 825*l*(a), and a petition for review of a Commission decision denying the application for rehearing must have been filed within sixty days of the denial, 16 U.S.C. § 825*l*(b). The Department sought neither rehearing nor review in 1949, and is, therefore, precluded from doing so now under the guise of an application for a preliminary permit. *See Distrigas Corp. v. F.E.R.C.*, 608 F.2d 25, 27 (1st Cir. 1979); *Louisville Gas and Electric Co. v. F.P.C.*, 129 F.2d 126, 130–31 (6th Cir. 1942), *cert. denied*, 318 U.S. 761, 63 S.Ct. 559, 87 L.Ed. 1133 (1943).

*Affirmed.*