**KAMARGO CORPORATION, et al., Petitioners,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Niagara Mohawk Power Corp., Intervenor.**

No. 87–1352.

United States Court of Appeals, District of Columbia Circuit.

Argued March 25, 1988.

Decided Aug. 9, 1988.

Patrick M. Hanlon, with whom Stephen J. Hadley and Sanford L. Hartman, were on the brief, for petitioners.

Samuel Soopper, Atty., F.E.R.C., with whom Catherine C. Cook, Gen. Counsel, and Jerome M. Feit, Sol., F.E.R.C., were on the brief, for respondent.

William J. Madden, Jr., McNeill Watkins, II and Steven J. Riggs were on the brief, for intervenor Niagara Mohawk Power Corp.

Before EDWARDS, SILBERMAN, and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Petitioners, Kamargo and ten other related corporations ("Kamargo"), seek review of a decision by the Federal Energy Regulatory Commission ("FERC") denying their applications for preliminary permits under 16 U.S.C. § 797(f) (1982). The permits Kamargo sought would have authorized it to

study the feasibility of developing currently unlicensed generating capacity at or near eleven separate hydroelectric projects in upstate New York. Those projects are licensed to and operated by intervenor Niagara Mohawk Power Corporation ("Niagara"). FERC denied the applications based primarily on its reading of the recently passed Electric Consumers Protection Act of 1986 ("ECPA"), which the Commission thought indicated it should not grant preliminary permits for development of excess capacity at or near a site where relicensing of the original licenses is "imminent"—in this case within eight years. Since we do not believe FERC's position is based on a reasonable construction of ECPA, nor is it otherwise adequately explained, we grant Kamargo's petition and remand for further consideration.

## I.

### A.

FERC is charged under the Federal Power Act ("FPA") with regulating and promoting the development of non-federally owned hydroelectric power in the United States. 16 U.S.C. §§ 791a *et seq.* (1982 & Supp. IV 1986). It grants licenses for construction, operation, and maintenance of facilities necessary to that development. When licensing a project for the first time, the Commission grants an "original" or "initial," license to the party whose proposed project will be the "best adapted to a comprehensive plan for improving the waterway ... [and] water-power development." 16 U.S.C. § 803(a)(1) (1982 & Supp. IV 1986). In light of the expense involved in hydroelectric development, FERC has traditionally granted licenses for long periods of time (up to fifty years) to make an individual project more attractive relative to the risks involved. *City of Batesville*, 38 F.E.R.C. ¶ 61,105 (1987).

Congress has also authorized FERC to issue preliminary permits for the limited purpose of "maintaining priority of application for a license ... as ... may be necessary for making examinations and surveys, for preparing maps, plans, specifications, and estimates, and for making financial

arrangements." 16 U.S.C. §§ 797(f), 798 (1982). Preliminary permits take some of the risk out of the exploration of hydroelectric power by giving developers who obtained them a preference when it comes time for the initial licensing of a project. *See National Wildlife Fed'n v. FERC*, 801 F.2d 1505, 1508 (9th Cir.1986); *Appomattox River Water Auth. v. FERC*, 736 F.2d 1000, 1003–04 (4th Cir.1984); *City of Bedford v. FERC*, 718 F.2d 1164, 1166 (D.C. Cir.1983).

A preliminary permit holder, in the event of a contest, is in the most preferred position to receive an original license under the FPA and the Commission's regulations. The statute gives a preference for a license to states and municipalities as against any applicant *other than a permit holder* if its plans are "equally well adapted." 16 U.S.C. § 800(a) (1982 & Supp. IV 1986). In addition, the statute gives a permit holder substantial control over the timing of applications for an original license. For the duration of the permit (up to three years) the permit holder has the absolute right to initially file for the original license. 16 U.S.C. § 798; *see also* 18 C.F.R. 4.33(b) (1987). Only after the permit holder files can a competitor intervene. By regulation, FERC has further enhanced the value of this preference requiring that if two or more applicants for an original license are "equally well adapted," then FERC must break the tie in favor of a permit holder. 18 C.F.R. § 4.37(c)(1) (1987). And, if the Commission considers a preferred applicant's proposal to be not as well adapted as a competitor's, the applicant is told by the Commission in what fashion it falls short and is given a "reasonable period of time" to amend its application so that it is at least "as well adapted" as its competitor's. 18 C.F.R. § 4.37(c)(2) (1987). It is thus rather obvious that the statute and FERC's regulations give the holder of a preliminary permit an enormous advantage over all others in pursuit of an original license. It is also clear that a state or municipality— which is preferred against other competitors in the event of a contest for a prelimi-

nary permit [1]—is also in a favored status and, if the holder of a preliminary permit as well, a crushing favorite to gain an original license.

As we noted, original licenses under the FPA (passed in 1920) typically were granted for fifty years. It was only in the 1970's, then, that the Commission was confronted with the question whether the municipal preference applied at the time an investor-owned utility sought a license, or in statutory terms a "new license." *See* 16 U.S.C. § 808 (1982 & Supp. IV 1986); 18 C.F.R. § 4.30(b)(19) (1987). The Commission initially said "yes" and then reversed itself; and as the issue was being litigated in several courts of appeals,[2] Congress intervened. Congress was concerned that if the municipal preference applied at the time of relicensing and caused transfers of projects, consumers would end up paying higher rates for electricity—a particularly serious problem since the "bulk of licenses expiring over the next 15 years are held by investor-owned utilities." S.REP. No. 161, 99th Cong., 1st Sess. 5–6 (1985). Congress, through ECPA, determined that the municipal preference should not apply to a new license. Although a state or municipality can prevail over an incumbent investor-owned utility that seeks to renew a license if the former's proposal is "best adapted," "insignificant differences ... between competing applications are not determinative and *shall not* result in the transfer of a project." 16 U.S.C. § 808(a)(2) (1982 & Supp. IV 1986) (emphasis added); *see also*

132 CONG.REC. H8953 (daily ed. Oct. 2, 1986) (statement of Rep. Shelby) ("public should not suffer the disruptions and economic dislocations that would be associated with a license transfer unless a good reason in the public interest has been shown."). Moreover, the Commission shall consider the incumbent's track record, or "record of compliance with the ... existing license" as well as "actions taken by the existing licensee related to the project which affect the public." 16 U.S.C. § 808(a)(3) (1982 & Supp. IV 1986). The municipal preference thus was actually reversed in a relicensing to create a marginal incumbent preference.

Congress also constructed a timetable for applicants for a new license. The incumbent, or existing licensee must notify the Commission that it intends to file for a new license at least five years before the expiration of the existing license, and its application must be received at least two years before expiration. 16 U.S.C. § 808(b)(1), (c)(1) (1982 & Supp. IV 1986). Nothing in ECPA's timing or preference provisions for relicensing altered or modified in any fashion the statutory provision governing the grant of an original license or a preliminary permit. "[T]hese provisions do not apply to original licenses. They apply only to existing licensees and their competitors." H.R.REP. No. 507, 99th Cong., 2d Sess. 33 (1985), U.S.Code Cong. & Admin.News 1986, pp. 2496, 2520. In fact, both before and after ECPA, the Commission operated under the same standard for

---

**1.** FERC is required to give *general* notice to the public of any preliminary permit application by publication in a newspaper where the project is located. In addition, the Commission must give *individualized* notice to any state or municipality that might be interested or affected by the granting of the permit. 15 U.S.C. § 797(f) (1982); *see also* 18 C.F.R. § 4.32(c)(2) (1987). Like the permit holder, a state or municipality also enjoys the right of last amendment, allowing it to amend its application so that it is "as well adapted" as its competitor's. 18 C.F.R. § 4.37(b)(4) (1987).

**2.** FERC first said that the municipal preference did extend to relicensing in *City of Bountiful,* 11 F.E.R.C. ¶ 61,337, *reh'g denied,* 12 F.E.R.C. ¶ 61,179 (1980), *aff'd, Alabama Power Co. v. FERC,* 685 F.2d 1311 (11th Cir.1982), *cert. de-*

*nied,* 463 U.S. 1230, 103 S.Ct. 3573, 77 L.Ed.2d 1415 (1983). The Commission changed its course and concluded the municipal preference did not apply at relicensing in the celebrated Merwin Dam case. *Pacific Power & Light Co.,* 25 F.E.R.C. ¶ 61,052, *reh'g denied,* 25 F.E.R.C. ¶ 61,290 (1983). FERC's position was also upheld in 1987 by this court sitting *en banc* in *Clark–Cowlitz Joint Operating Agency v. FERC,* 826 F.2d 1074 (1987), *reversing Clark–Cowlitz Joint Operating Agency v. FERC,* 775 F.2d 366 (D.C.Cir.1985). The court's 1987 *en banc* decision, coming one year after Congress had already codified FERC's position in ECPA, had a limited reach; it covered only the parties to that lawsuit, who had prevailed upon Congress to exempt them from the new statute's coverage. *See* ECPA § 11 ("grandfather clause").

granting both original and new licenses, by ensuring that the "project adopted ... will be best adapted to a comprehensive plan for improving or developing a waterway." 16 U.S.C. § 803(a) (1982 & Supp. IV 1986). ECPA did make, however, one change that affected both original and new licenses. Congress required that the Commission give equal consideration to non-developmental values, principally environmental ones, in granting all licenses. *See* 16 U.S. C. §§ 797(e), 803(a), 808(a) (1982 & Supp. IV 1986); H.R.CONF.REP. No. 934, 99th Cong., 2d Sess. 21–22 (1985).

### B.

One year before ECPA's enactment, in October 1985, Kamargo, an investor-owned utility, filed with the Commission eleven preliminary permit applications to study the future development of additional *unutilized* water resources at existing projects licensed to Niagara. Each application proposed installation of a new Kamargo power plant on the same river and in the general vicinity (although most on the opposite bank of the river) of an existing hydroelectric plant licensed to and operated by Niagara. Also an investor-owned utility, Niagara's fifty-year licenses on all of these projects expire December 31, 1993. Kamargo then took the first step—applying for a preliminary permit—in the process, which as we have explained, leads to the grant of an *original* license in areas close to projects that will shortly be the subject of *new* license proceedings.

Niagara, after the Commission issued public notice of Kamargo's applications, intervened and protested, claiming that the requested permits contemplated projects that would interfere with its licensed projects in contravention of section 6 of the FPA. 16 U.S.C. § 799 (1982). Alternatively, Niagara contended that with its relicensing procedures imminent, the public in-

terest would not be served by granting Kamargo's permit application. Niagara thus sought to protect a claim it might subsequently make to harness capacity it was not then licensed to use. It did not, however, file competing applications for the permits.

The Commission denied Kamargo's application for the permits on grounds that issuing them would be "inconsistent" with ECPA's relicensing procedures because if Niagara itself wished to seek the relicensing it would probably be obliged to file at the end of Kamargo's three year permit, in early 1990. Yet under the schedule established by ECPA, Niagara was not obligated to file before December 1991, the minimum two years prior to termination of existing licenses that ECPA would require in this case. *Kamargo Corp.*, 37 F.E.R.C. ¶ 61,281, at 61,844 (1986), *reh'g denied*, 39 F.E.R.C. ¶ 61,226 (1987).[3] The Commission, recognizing that a holder of a preliminary permit enjoys substantial preferences (for an original license) under its regulations, further concluded that ECPA's resolution of the preference issue at relicensing—that the incumbent's "track record" will be dispositive if there are no significant differences in the applications—"pre-empted" that regime. *Id.* Implicit—but not stated —in the Commission's decision was the assumption that excess capacity on a river near an existing project should be treated as the subject of a new license in a relicensing proceeding rather than as an original license.

The Commission, however, pointed to nothing in ECPA's language or legislative history to support this assumption, and Commissioner Trabandt's dissent sharply challenged FERC's reliance on ECPA as wholly unjustified. *Id.* at 61,845–49. He also argued that the Commission's ruling did not serve the public interest because it stifled Kamargo's present interest in devel-

---

**3.** A competing application for an original license is usually due at a date specified by FERC as the "intervention deadline." 18 C.F.R. § 4.36(b) (1987). In this case, the Commission estimated that the intervention date would most likely be set a few months after Kamargo applied for an original license. 37 F.E.R.C. at

61,844. It was the Commission's judgment that, based on past practice, Kamargo would probably wait until the end of its three-year permit to file (late 1989) and Niagara would thus have to intervene a few months later (early 1990).

opment based only on the future possibility that Niagara would seek authority to develop and use "excess capacity" on the rivers involved, stretching for an unspecified distance from the existing projects. *Id.* He would, however, have denied seven of the eleven projects because he thought they actually interfered (within the meaning of section 6 of FPA)[4] with Niagara's existing projects. *Id.*

Denying Kamargo's petition for rehearing, the Commission, in a new opinion, sought to buttress its reliance on ECPA. 39 F.E.R.C. ¶ 61,226 (1987). Again, without ever explicitly stating whether it would treat the excess capacity as the subject of an original license or a new license, the Commission claimed its longstanding practice was to license excess capacity at the time of relicensing and that ECPA "called for" just that approach since it "required" the Commission to consider an applicant's new license plans for improvement and use of the whole waterway. *Id.* at 61,790. The Commission disputed its dissenting colleague's argument (reiterated in a fresh dissent) that this approach discouraged competition and denied that it was in effect giving the incumbent a preference extending beyond its existing license. *Id.* at 61,-791. Kamargo could, according to FERC, still study the proposed project and apply—presumably in a contest with Niagara—at the time Niagara sought a new license. *Id.* Finally, the Commission said that it had the discretion to deny permits under the FPA and that granting them here would "not be appropriate and in the public interest." *Id.*

Ironically, the Commission's decision, apparently driven by its concern to avoid future squabbles between a claimant asserting a municipal preference for an original license covering excess capacity and an in-. cumbent investor-owned utility asserting an incumbent preference at relicensing, comes in a case where two privately-owned utilities are in conflict.[5] We do, nevertheless, understand the Commission's underlying concern, but we agree with the dissent, at least insofar as it accuses the majority of using ECPA artificially to support a policy decision to break with the Commission's past treatment of excess capacity licensing—a break that might or might not be justified under the Federal Power Act. We also agree that the Commission did not adequately consider other alternatives—such as modification of its regulations concerning a preliminary permit holder's right of last amendment—that might better serve the public interest than denying all of Kamargo's applications for permits. *Id.* at 61,794.

## II.

The Commission asserts a "longstanding practice" of considering the installation of new project works at the time of relicensing. *Id.* at 61,790 (citing *City of Batesville*, 38 F.E.R.C. ¶ 61,105 (1987); *Montana Power Co.*, 56 F.P.C. 2008 (1976)). Apparently, the Commission has in the past granted *new* licenses to incumbent licensees who wish to include additional development at the site in their *new* license.

> Indeed, if preliminary permits were to be issued in this kind of a situation, as urged by [Kamargo], then presumably the preference for state or municipal applicants would also apply by their obtaining permits or by characterizing the matter as an "original license" proceeding. While we recognize that in these present permit proceedings there were no competing applications filed by a state or municipality, a preference for such applications would certainly seem to follow from [Kamargo's] arguments. Such a preference would further contravene the provisions of ECPA since state or municipal applicants would be able to obtain that which ECPA was enacted to avoid.

---

**4.** Section 6 of the FPA provides that once issued, licenses "may be altered or surrendered only upon mutual agreement between the licensee and the Commission." 16 U.S.C. § 799 (1982). Commissioner Trabandt believed that seven of "[Kamargo's] proposed developments would require significant demolition of existing licensed project works" and were thus a clear violation of section 6 because Niagara had not given its consent. 37 F.E.R.C. at 61,846.

**5.** In footnote 12 to its Denial of Rehearing, 39 F.E.R.C. at 61,791 n. 12, 61,793, the Commission explained that part of its concern was with the possibility that municipalities might, through the back door of the permit process, gain access to the excess capacity, thus squeezing out the incumbent:

*See Niagara Mohawk Power Co.*, 29 F.E.R.C. ¶ 61,004, at 61,010 (1984). In *Niagara*, the Commission explained that "[t]o foreclose licensees from proposing new project works in a relicensing proceeding ... serves no purpose and clearly undermines our Section 10(a) [§ 803(a) ] responsibility." 29 F.E.R.C. at 61,010-11. But it is quite unclear whether the new project works to which the Commission referred in *Niagara* were designed to harness added capacity (water flows not then currently utilized) or to upgrade utilization of existing capacity.

■ In any event, the Commission has also granted *original* licenses to third parties who seek development of additional capacity adjacent to previously licensed projects. In *Town of Madison*, 11 F.E.R.C. ¶ 61,318 (1980), the Commission granted a three-year preliminary permit (over the incumbent's protest) to develop additional capacity not covered by the existing license but within the "project's boundaries."[6] *Id.* at 61,672; *cf. Gas & Elec. Dep't of Holyoke v. FERC*, 629 F.2d 197, 203 & n. 10 (1st Cir.1980). Indeed the Commission has, since 1964, routinely included a clause in original licenses warning licensees that the Commission can order installation of additional capacity and has stated that the license "does not serve to preclude third parties from applying for preliminary permits or licenses for proposed new project works that might be located within the boundary of the previously licensed project." *Town of Madison*, 11 F.E.R.C. at 61,672. In short, prior to ECPA's passage it would appear the Commission erected no barrier to the grant of permits such as Kamargo has sought here.

Because of the *presence* of a third-party competitor (Kamargo) who is seeking a permit and the *absence* of an incumbent formally expressing an interest in licensing the excess capacity, we believe this case more akin to *Madison* than *Niagara*, thus making Kamargo's argument that the excess capacity is properly the subject of an original license more powerful. It may well be that *Town of Madison* is distinguishable and/or that there are policy reasons based on the FPA that support FERC's decision, but the Commission has failed to articulate that rationale, *see MCI Telecommunications Corp. v. FCC*, 842 F.2d 1296, 1300 (D.C.Cir.1988), other than to claim its decision justified based on its discretion, its assertion of the "public interest," and an imaginative reading of ECPA.

Of course, an agency is entitled to considerable deference in interpreting a statute it is authorized to administer, *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 31-32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981), and we therefore may not quarrel with its interpretation so long as it is reasonable. *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). But in this case, we are hard put to see much merit in FERC's construction of ECPA. The statute does not even purport to deal with original licenses or preliminary permits (outside of environmental considerations for licenses). As will be recalled, the House Report said "these [relicensing] provisions do not apply to original licenses." H.R.Rep. No. 507, *supra*, at 33.

FERC claimed in its opinion on rehearing that it was "required" at the time of relicensing to consider the appropriate disposition of excess capacity. 39 F.E.R.C. at 61,790. If that is so, it was so prior to the passage of ECPA since nothing in that amendment to the FPA deals with the point. The operative standard for granting a license—"best adapted to a comprehensive plan"—was unchanged by ECPA. *See* 16 U.S.C. § 803(a). Be that as it may, whether or not the Commission must consider excess capacity if an incumbent licensee or other applicant seeks to develop it pursuant to a new license does not decide the wholly separate issue whether the Commission can or should consider the disposition of excess capacity in an original license proceeding at the instance of a third party (preceded by a preliminary permit) some

---

6. We confess to a good deal of confusion as to the Commission's definition of a project's boundaries.

period of time before a relicensing proceeding.[7] To be sure, ECPA was, in large part, designed to resolve the relative position of those who enjoyed a municipal preference and the investor-owned utilities at the time the latter sought a new license, and this case, although it involves only two investor-owned utilities, will have an impact on that rivalry. Still, neither the language nor the legislative history permits the construction FERC adopts: that ECPA precludes granting preliminary permits to develop excess capacity at or near an existing project at a time close to relicensing. Since ECPA did not address this point either explicitly or implicitly, the Commission has, it seems to us, pushed beyond the outer limits of *Chevron* by making a policy choice supposedly supported by provisions of a statute that do not apply to the issue.[8] If Congress, for example, banned only the importation of apples, an agency charged with carrying out this hypothetical statute would be unjustified if, based on the statute, it decided to ban the importation of oranges as well.

■ The Commission alternatively argues, as it indicated in its opinion on reconsideration, that Kamargo has no legal right to a permit. 39 F.E.R.C. at 61,790. FERC, under the Federal Power Act, is not obliged to issue permits to anyone who seeks them. *See* 16 U.S.C. § 797. That may be so, but FERC is not entitled to deny a permit arbitrarily and capriciously under the Adminis-

trative Procedure Act, 5 U.S.C. § 706(2)(A) (1982), which means that the Commission must find acceptable legal support under its authorizing statute if it wishes to pursue the policy that underlies its decision here. We recognize that this case presents a difficult problem for the Commission, but we think it has no alternative but to confront the questions raised by the dissent. How does it justify a reversal of its *Town of Madison* policy under the Federal Power Act? If it does, how will it draw the boundaries of the area near an existing project but nonetheless outside the immediate confines of the project that are off limits to parallel development and licensing? And why cannot amendment of its existing regulations adequately ameliorate the difficulties the Commission foresees in permitting Kamargo to have preliminary permits—at least those that do not "interfere" under section 6 with Niagara's projects?[9]

It seems to us, although the Commission does not admit it, that FERC saw the issue before it as a zero-sum game. If Kamargo received the permits it would virtually inevitably prevail in an original licensing proceeding focused on the excess capacity. If it did not, then Niagara would surely control the river's development. If that were so, perhaps FERC's position could be affirmed. But, it is not at all apparent that no middle ground could be fashioned that encourages some measure of competition in

---

**7.** Petitioners assert that FERC's determination that eight years prior to a relicensing is "imminent" is arbitrary and capricious. Arbitrary it may well be without being capricious. This sort of line drawing—assuming the Commission satisfactorily deals with the other issues in the case—may be done, at the Commission's option in case-by-case adjudication rather than rulemaking. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 290–95, 94 S.Ct. 1757, 1770–72, 40 L.Ed.2d 134 (1974).

**8.** The Commission might determine that ECPA's command that FERC consider environmental values on par with development values in all license applications (both original and new) is relevant to answer Commissioner Trabandt's concern as to the outer boundaries of a project (how much of the waterway's development should be considered all at one time). *See* 16

U.S.C. §§ 797(e), 803(a), 808(a) (1982 & Supp. IV 1986). That ECPA's new environmental considerations were an important factor in FERC's decision was argued for the first time by counsel for the Commission on appeal, and we may not consider the argument since it was not relied upon by FERC in its opinion. *Burlington Truck Lines v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

**9.** One option possibly available to FERC is the extension of the intervention date, *see supra* note 3, so that Niagara would enjoy the same "right" to file for a license for the excess capacity on December 31, 1991 as it would under ECPA. FERC's concern that ECPA's December 31, 1991 filing date would be rendered useless given the probable intervention date of early 1990 if permits were granted could thus easily be met.

the public interest. FERC thus must explicitly consider the alternatives, and it may not rely on an impermissible interpretation of ECPA to solve its problem.

Because FERC's decision rests on a misapplication of ECPA, Kamargo's petition for review is granted and we remand the case to FERC for reconsideration consistent with this opinion.

*It is so Ordered.*