873 F.2d 419
 John KOKAJKO, d/b/a Voyagers Whitewater, Petitioner,
v.
UNITED STATES FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Central Maine Power Company, A Maine Corporation, Intervenor.
 No. 88-1498.
 United States Court of Appeals,
First Circuit.
 Heard Feb. 9, 1989.
Decided April 26, 1989.
 
 Robert Edmond Mittel with whom Mittel & Hefferan, Portland, Me., was on brief, for petitioner.
 Hanford O'Hara, Washington, D.C., with whom Catherine C. Cook, Gen. Counsel, and Joseph S. Davies, Deputy Sol., were on brief, for respondent.
 Thomas E. Mark, New York City, with whom Sarah A. Verville, Augusta, Me., John S. Pruitt, New York City, David A. Rich and LeBoeuf, Lamb, Leiby & MacRae, Boston, Mass., were on brief, for intervenor.
 Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.
 LEVIN H. CAMPBELL, Chief Judge.
 
 
 1
 John Kokajko petitions this court to review the dismissal by the Federal Energy Regulatory Commission ("Commission") of his complaint filed with the Commission. Kokajko's complaint challenged a fee charged by Central Maine Power Company ("CMP"), the operator of a hydroelectric power plant, for the use of recreational facilities on CMP's property by commercial rafting operators such as Kokajko. We sustain the Commission's dismissal of Kokajko's complaint.
 
 
 2
 In 1954, the Federal Power Commission,[1] exercising its regulatory authority under the Federal Power Act, 16 U.S.C. Secs. 791a et seq. (1982 & Supp. IV 1986), issued a license to CMP for the construction and operation of a hydroelectric power plant on the Kennebec River in Maine. The boundaries of this plant, known as Indian Pond Project No. 2142 ("project"), encompass the Harris Station dam, reservoir, powerhouse, and adjoining lands owned by CMP. The project boundary ends approximately 2,000 feet downstream from the dam. Below this boundary, the Kennebec River runs through nearly 12 miles of undeveloped non-project land privately owned by CMP. See Central Maine Power Co., 13 F.P.C. 1076 (1954), amended 19 F.P.C. 589 (1958).
 
 
 3
 Before issuing a license, the Commission is required by section 10(a) of the Federal Power Act, 16 U.S.C. Sec. 803(a), to assure that the "project adopted ... will be best adapted to a comprehensive plan for ... beneficial public uses, including recreational purposes...." Article 7 of the license involved in this case requires CMP to "allow the public free access, to a reasonable extent, to project waters and adjacent project lands owned by the licensee for purposes of full public utilization of such lands and waters for navigation and recreational purposes...." Article 7 allows CMP to subject the use of recreational facilities constructed on project land "to payment of rent to the licensee in a reasonable amount."[2] Regulations promulgated under the Act similarly require CMP to develop project land for recreational purposes and allow CMP to charge "reasonable fees to users of such facilities in order to help defray the cost of constructing, operating, and maintaining such facilities." 18 C.F.R. Sec. 2.7 (1988).
 
 
 4
 One of the popular "recreational purposes" to which the project and the Kennebec River is put is whitewater rafting. Taking advantage of the whitewater created by CMP's regulation of the water flowing through the project dam, a dozen or so commercial outfits, including Kokajko's "Voyagers Whitewater," carry groups of people down the river for a fee. These rafting trips traverse both project and non-project land owned by CMP. Within the actual project boundaries are an access road to the river, a parking lot, rest rooms, a put-in site for the rafts, and about a 2,000-foot stretch of the 12 miles of river used for the rafting trip. Beyond the project boundaries, within other land owned by CMP, is the over 11- 1/2 miles of river on which most of the rafting trip occurs. This non-project portion of the trip encompasses the whitewater stretches of the river, several picnic areas along the way, a take-out site at the end of the trip, and an exit road. Beginning in 1981, CMP charged the commercial rafting outfits $5 per person taken down the river; this fee was raised to $6 in 1983.
 
 
 5
 On April 18, 1983, Kokajko filed a complaint with the Commission pursuant to 18 C.F.R. Sec. 385.206 (1988) alleging that CMP's fee was excessive because it generated revenues substantially above CMP's costs of providing public access to the river, thus violating 16 U.S.C. Sec. 803(a) as well as Article 7 of CMP's project license. The Commission initially agreed with Kokajko and issued an order on August 23, 1984, requiring CMP to reduce the fee and to refund the excess fees it had collected. On July 24, 1987, however, the Commission granted CMP's request for a rehearing and dismissed Kokajko's complaint. Explaining that its August 23, 1984 order was mistakenly "based on an understanding that Central Maine's access fee was for access to and use of project facilities" rather than non-project facilities as well, the Commission stated in its July 24, 1987 order,
 
 
 6
 Central Maine correctly points out that the Commission has no jurisdiction over its licensees' private, non-project lands, and has no authority over any fee that Central Maine may charge for use of these lands or any facilities thereon. Therefore, in order to ascertain whether Central Maine's fee for the use of facilities within the project boundary is reasonable, we requested and received from Central Maine additional data apportioning the fee between project and non-project facilities.
 
 
 7
 After describing this data, the Commission concluded that, while CMP's calculations regarding project-related costs were somewhat high, the access fee was "acceptable and not in violation of Article 7 of the license" given the fact that the $6 fee "covers both project and substantial non-project facilities."
 
 
 8
 Kokajko requested a rehearing of the Commission's July 24, 1987 order. After issuing a tolling order to provide itself time to consider the merits of this request, the Commission denied Kokajko's request for rehearing in an order dated March 28, 1988.[3] The Commission reiterated in its March 28 order that it had no jurisdiction to review the fees charged for the use of non-project land and facilities despite the fact that "the public's use of non-project lands and facilities occurs in connection with its use of project lands or facilities." It also amplified its finding that the portion of the $6 fee allocated to the use of project facilities was not unreasonable:
 
 
 9
 In reviewing the information provided by Central Maine, it is apparent that the company has in the past not kept precise records of its whitewater rafting-related expenses or of the breakdown of those costs between project and non-project lands and facilities. While we regarded the $3.88 per customer allocation to project-related expenses was [sic] somewhat high, we concluded that it was not unreasonable. Moreover, since we have no authority over the non-project fee that Central Maine can charge the rafters, we conclude it is an unwarranted expenditure of the Commission's resources to pursue obtaining an exact accounting of the pertinent costs. According to Central Maine, under state law it has a right to charge for access to its private lands.... [I]t appears that the part of the $6.00 fee not attributable to project recreational facilities can be recovered by the licensee in the portion of the fee relating to use of non-project facilities. The result to the rafters will be the same.
 
 
 10
 Kokajko petitions us to review this order pursuant to 16 U.S.C. Sec. 825 1.
 
 
 11
 Kokajko argues, first, that the Commission erred in ruling that, under the Federal Power Act, it lacked jurisdiction over CMP's non-project facilities and land. We review the Commission's determination of its statutory authority under standards recently described by the Supreme Court:
 
 
 12
 On a pure question of statutory construction, our first job is to try to determine congressional intent, using "traditional tools of statutory construction." If we can do so, then that interpretation at issue must be fully consistent with it. However, where "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."
 
 
 13
 NLRB v. United Food & Commercial Workers Union, Local 23, 484 U.S. 112, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 1220, 94 L.Ed.2d 434 (1987) and Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781-82, 81 L.Ed.2d 694 (1984)). See also Midtec Paper Corp. v. United States, 857 F.2d 1487, 1496-97 (D.C.Cir.1988); International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Brock, 816 F.2d 761, 764-65 (1st Cir.1987); Violet v. FERC, 800 F.2d 280, 282 (1st Cir.1986); Gas & Electric Department v. FERC, 629 F.2d 197, 202-03 (1st Cir.1980). In reviewing the agency's interpretation of its statutory mandate, a reviewing court should also consider the consistency with which the agency's interpretation has been applied. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." Cardoza-Fonseca, 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30 (citations omitted). See also United Food & Commercial Workers Union, 108 S.Ct. at 421 n. 20.
 
 
 14
 Applying these standards, we observe, first, that the Federal Power Act is itself silent with respect to the issue in question. We must ask, therefore, whether the Commission's own interpretation of its statutory authority over non-project activity is "based on a permissible construction of the Act," being "rational and consistent with the statute." Id. at 421. We believe it is. The Commission's regulatory powers are, to be sure, broad, viz., "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter." 16 U.S.C. Sec. 825h. These powers, however, are to be exercised "to carry out the provisions of this chapter," and those provisions are confined to projects and project works.[4] For instance, the Commission's licensing authority is defined as follows:
 
 
 15
 The Commission is authorized and empowered ... [t]o issue licenses [to various entities] for the purpose of constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States....
 
 
 16
 16 U.S.C. Sec. 797(e) (emphasis added).
 
 
 17
 Similarly limited to "project" and "project works" are the conditions the Commission must impose on applicants before issuing a license. The condition most pertinent to this case requires that the "project adopted ... be best adapted to a comprehensive plan ... for beneficial public uses, including ... recreational ... purposes...." 16 U.S.C. Sec. 803(a)(1) (emphasis added). See also 16 U.S.C. Sec. 802(a) (requiring applicant to submit information "as may be required for a full understanding of the proposed project ") (emphasis added); 16 U.S.C. Sec. 803(b) (forbidding substantial alteration of project works without prior approval); 16 U.S.C. Sec. 803(c) (requiring licensee to maintain project works ); 16 U.S.C. Sec. 806 (imposing time limits for construction of project works ); 16 U.S.C. Sec. 800(c) (assumption of project by United States after expiration of license).
 
 
 18
 The Commission has been consistent in its refusal to exercise regulatory power over non-project land and facilities. In Sierra Club v. Nebraska Public Power District, 53 F.P.C. 1836 (1975), the Commission refused to issue an order enjoining the construction by a licensee of a steam electric generating facility being built just outside the project boundary because "our jurisdiction here is with respect to the project and we should not stop this construction beyond that point."[5] See also South Carolina Electric & Gas Co., 8 FERC Sec. 61,161 at 61,609 (1979). Article 7 of CMP's project license as well as the regulations promulgated under the Federal Power Act regarding recreational development at licensed projects, 18 C.F.R. Sec. 2.7, both limit the Commission's authority to project land. See page 421, supra.
 
 
 19
 We consequently find that it was a permissible construction of the Act for the Commission to rule that, both under the Act itself and the license involved in this case, the Commission lacked jurisdiction to regulate the fee charged for the use of CMP's non-project property. This interpretation of the statute is also consistent with the view taken by the Second Circuit, albeit in a different context, in Niagara Falls Power Co. v. FPC, 137 F.2d 787, 795-96 (2d Cir.), cert. denied, 320 U.S. 792, 64 S.Ct. 206, 88 L.Ed. 477 (1943). The court held there that the Commission could not include non-project lands and the profits derived from the transfer of such lands in calculating the licensee's "net investment in a licensed project" under Section 4(b) of the Federal Power Act, 16 U.S.C. Sec. 797(b). Judge Learned Hand, writing for the court in Niagara Falls, stated that the "Commission's jurisdiction under Sec. 4(b) is limited to determining the cost of the 'net investment in a licensed project,' " and that " 'non-project' lands ... should certainly not be included within 'net investment' of the 'project,' but should be treated as though they were not owned by the [licensee] at all." Id. (emphasis added).
 
 
 20
 As the Commission permissibly determined that it had no jurisdiction over non-project activity, it was entitled to hold that its authority was limited to determining whether the fee charged for use of project facilities and land was reasonable under Article 7 of CMP's project license and 18 C.F.R. Sec. 2.7. The latter allows a licensee "to charge reasonable fees to users of [recreational] facilities in order to help defray the cost of constructing, operating, and maintaining such facilities." After being ordered by the Commission to apportion the $6 per person fee between the project and non-project portions of the rafting trip, CMP claimed that its rafting-related expenses for the project portion amounted to $3.88 for 1985-86.[6] Kokajko argued, as he does on appeal, that this sum is excessive for a variety of reasons: for example, according to Kokajko, CMP's purported administrative expenses related to rafting were unsubstantiated and too high, and CMP wrongly included legal fees for "rafting related regulatory issues" in its calculation of rafting-related costs. The Commission agreed that the $3.88 sum was "somewhat high" and that CMP had not submitted an "exact accounting" of its project-related expenses. But the Commission nonetheless declined to decide that this sum was unreasonable, or to require an exact accounting, given the fact that whatever part of this sum (if any) was found to be excessive could simply be recovered by CMP by increasing by a corresponding amount the fee charged for the non-project portion of the rafting trip.
 
 
 21
 Given especially that the Commission's doubts as to the fairness of the project-related fee were relatively minor, we think its overall resolution was reasonable and within its authority. If, to take an example, the Commission had ordered CMP to reduce the $3.88 project-related fee by 25cents, CMP could justify the 25cents as part of its non-project-related fee, and the total rafting fee of $6 would remain unchanged. As the Commission stated in denying Kokajko's request for a rehearing, "[t]he result to the rafters will be the same." This is not to suggest that we would approve this rationale to justify a totally unreasonable allocation as between project and non-project costs, but in the present circumstances the Commission was well within its authority.
 
 
 22
 The petition for review is denied and the order of the Commission is affirmed.
 
 
 
 [1]
 The Federal Power Commission was the predecessor to the Federal Energy Regulatory Commission. The latter was created in 1978 by the Department of Energy Organization Act Sec. 402, 42 U.S.C. Secs. 7171, 7172 (1982)
 
 
 [2]
 Article 7 states in full:
 So far as is consistent with proper operation of the project, the licensee shall allow the public free access, to a reasonable extent, to project waters and adjacent project lands owned by the licensee for purposes of full public utilization of such lands and waters for navigation and recreational purposes, including fishing and hunting, and shall allow to a reasonable extent for such purposes the construction of access roads, wharves, landings, and other facilities on its lands the occupancy of which may in appropriate circumstances be subject to payment of rent to the licensee in a reasonable amount. Provided, that the licensee may reserve from public access such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection of life, health, and property and Provided further, that the licensee's consent to the construction of access roads, wharves, landings, and other facilities shall not without its express agreement place upon the licensee any obligations to construct or maintain such facilities.
 
 
 [3]
 Before the Commission issued its final order on March 28, 1988, Kokajko petitioned this court to review the administrative proceedings below. This petition was dismissed for lack of appellate jurisdiction. Kokajko v. FERC, 837 F.2d 524 (1st Cir.1988)
 
 
 [4]
 Section 3(11) and (12) of the Federal Power Act, 16 U.S.C. Sec. 796(11) and (12) define these terms as follows:
 (11) "project" means complete unit of improvement or development, consisting of a power house, all water conduits, all dams and appurtenant works and structures (including navigation structures) which are a part of said unit, and all storage, diverting, or forebay reservoirs directly connected therewith, the primary line of lines transmitting power therefrom to the point of junction with the distribution system or with the interconnected primary transmission system, all miscellaneous structures used and useful in connection with said unit or any part thereof, and all water-rights, rights-of-way, ditches, dams, reservoirs, lands, or interest in lands the use and occupancy of which are necessary or appropriate in the maintenance and operation of such unit;
 (12) "project works" means the physical structures of a project....
 Kokajko concedes that a substantial portion of the rafting trip is outside the "project."
 
 
 [5]
 Parts of the generating facility in Sierra Club were located on project land. In addition, the Commission subsequently found that the non-project parts of the facility, by using project waters, constituted a "substantial alteration" of the project reservoir. 16 U.S.C. Sec. 803(b). Given this, the Commission in a later proceeding in this case amended the project license to regulate the construction and operation of those parts of the facility located within the project, and also to assure that the entire facility's use of project land and waters was in accordance with the standards established by the Federal Power Act. Sierra Club v. Nebraska Public Power District, 55 F.P.C. 3048 (1976). While this amendment appears to indirectly affect the licensee's non-project property, the Commission was careful to base the amendment on its regulatory authority over the parts of facility which were located on project land and its duty to protect the project from substantial alteration by a licensee not in accordance with the Federal Power Act
 
 
 [6]
 CMP claimed that non-project related expenses amounted to 83cents. Thus, deducting the total claimed expenses ($3.88 + .83 = $4.71) from the $6 fee, CMP appears to have received a profit of $1.29 for each rafter. According to CMP, the fees it collects are credited to an account that is used to reduce electricity rates charged to CMP's customers